IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :     CRIMINAL ACTION
                                  :
          v.                      :
                                  :
EDWARD McCUSKER and               :
JACQUELINE McCUSKER               :     NO. 09-771-1, 5


MEMORANDUM

McLaughlin, J.                                    December 20, 2012


          Defendants Edward McCusker and Jacqueline McCusker
were indicted on charges of conspiracy to commit mail and wire
fraud, mail fraud, wire fraud, and conspiracy to launder
proceeds, in relation to an allegedly fraudulent foreclosure
relief operation.  Following a three-week trial, the jury
convicted Edward McCusker on all eleven counts and Jacqueline
McCusker on all but one count. The defendants now move for a
judgment of acquittal on all counts.  For the following reasons,
the Court denies the motion for a judgment of acquittal in part
and grants it in part.


  I.   Case Summary

          On December 8, 2007, a grand jury indicted Edward and
Jacqueline McCusker, along with three other co-defendants, on
fifteen counts stemming from a mortgage-based scheme to defraud.

The indictment charged that the defendants falsified and submitted, or conspired to falsify and submit, forged documents in order to obtain loans on properties which they and their straw purchasers acquired from homeowners facing foreclosure. These false documents included forged purchase and sale agreements, lease agreements, and loan applications. The indictment also charged the defendants with conspiring to launder the proceeds of that fraud.[1]

Beginning on May 31, 2011, Edward and Jacqueline McCusker were tried in front of a jury in the Eastern District of Pennsylvania. Through the course of the three-week trial, the prosecution presented testimony from fifteen witnesses to support their contention that the McCuskers knowingly and intentionally participated in the scheme to defraud and that they produced false statements in furtherance of this scheme.

For example, the jury heard testimony from John Bariana, a former partner of the McCuskers, about the nature and

---

[1]  Specifically, Count One charged Edward and Jacqueline McCusker with conspiracy to commit mail or wire fraud, in violation of 18 U.S.C. § 1349.  Counts Two through Five charged four specific instances of mail fraud.  Counts Six through Eleven alleged specific interstate wires related to two particular loans.  This included the forged purchase and sale agreements (Counts Six and Nine), false Settlement Statement forms (called "HUD-1" forms) (Counts Seven and Ten), and wire transfers that resulted from the falsely produced documents (Counts Eight and Eleven).

structure of the mortgage scheme.  Mr. Bariana testified that
the general practice of American Mortgage, later Axxium
Mortgage, was to expedite the loan approval process using any
possible means.  Mr. Bariana described the various roles held by
the co-defendants, including the McCuskers; this included
falsifying purchase and sale agreements, promissory notes, and
creating fictitious leases.

    The jury also heard testimony from four homeowners who
had sold their homes through the program.  Each homeowner
testified that they had not signed any purchase and sales
agreements and that the signatures on such agreements, purported
to be theirs, did not in fact belong to them.

    In addition, a representative from Long Beach Mortgage
Company, James McDiarmid, testified as to its loan-making
process.  Long Beach was one of the lenders used by American
Mortgage and Axxium Mortgage.  Mr. McDiarmid testified that in
order to initiate a loan processing at Long Beach, a broker must
first provide to them a purchase and sales agreement via mail.
Subsequently, during the process of determining "conditional
loan approval," Long Beach required that the broker fax to them
other types of documents, including documents confirming
employment and income from leases.  In his capacity as custodian
of records, Mr. McDiarmid also testified that such documents

were found in the possession of the electronic files of Long
Beach and introduced into evidence in the instant case.

On June 22, 2011, the jury found Edward McCusker
guilty of all eleven counts: one count of conspiracy to commit
mail and wire fraud, four counts of mail fraud, six counts of
wire fraud, and conspiracy to launder the proceeds of that
fraud. The jury acquitted Jacqueline McCusker of one count of
mail fraud and convicted her on each of the remaining counts.

## II. Sufficiency of Evidence

### A. Standard of Review for Overturning a Jury Verdict

Defendants are entitled to a judgment of acquittal
under Rule 29 of the Federal Rules of Criminal Procedure if "the
evidence is insufficient to sustain a conviction." Fed. R. Crim.
P. 29(a). In determining whether this standard is satisfied, the
district court must view the evidence as a whole and in the
light most favorable to the government. United States v.
Hoffecker, 530 F.3d 137, 146 (3d Cir. 2008). A verdict will be
overruled "only if no reasonable juror could accept the evidence
as sufficient to support the conclusion of the defendant's guilt
beyond a reasonable doubt." United States v. Coleman, 811 F.2d
804, 807 (3d Cir. 1987) (citations omitted).

B.    Mail Fraud Convictions (Counts 2-5)

1.    Background

18 U.S.C. § 1341 prohibits any mailing through the United States Postal Service that is in connection with a scheme or artifice to defraud. 18 U.S.C. § 1341. The jury found Edward McCusker guilty of four instances of mail fraud and Jacqueline McCusker guilty of three. These instances relate to "packages" which contained closing documents for the sale and execution of four residences/loans. The packages were introduced into evidence by James McDiarmid, custodian of records for Long Beach Mortgage Company, as part of the company's electronic files. It is alleged that the four packages were mailed from co-defendants Bennett & Doherty to Long Beach.

The defendants argue that the government has not put forth sufficient evidence that the packages named in Counts 2 through 5 were mailed through the United States Postal Service.

2.    Analysis

To establish that a document was mailed in violation of 18 U.S.C. § 1341, the government may use evidence of business practice or office custom. United States v. Hannigan, 27 F.3d 890, 892 (3d Cir. 1994). The business practice evidence must, however, make "some reference to the correspondence in

question." United States v. Hitchens, No. 00-654-2, 2001 WL
1257167, at *2 (E.D. Pa. Oct. 19, 2001), citing United States v.
Burks, 867 F.2d 795, 797 (3d Cir. 1989). If these two elements
are established, the government "need not affirmatively disprove
every conceivable alternative theory as to how the specific
correspondence was delivered." Hannigan, 27 F.3d at 892-93.

The government argues that the testimony of Mr.
McDiarmid is sufficient evidence that the packages were mailed.
In his capacity as a regional operations manager of Long Beach
(and as custodian of its records), Mr. McDiarmid testified to
Long Beach's general policies and procedures during the period
at issue. He explained that a requirement of the closing
condition was that Long Beach would receive a final HUD-1 as
part of a package sent via "Federal Express or overnight."[2]

_____

[2]  The transcript of Mr. McDiarmid's testimony regarding Long
Beach's mailing requirement consists of the following:

        Q:   Okay. Mr. McDiarmid, before a loan – before those
    checks could be cut at the closing table, was there a
    requirement that Long Beach receive anything?
        A:   We needed to receive the copy of the HUD
    settlement statement so that we know that the disbursements
    of the funds, the fees being charged, all were the same as
    what we approved, so yes, they would have to fax us a copy
    of the HUD. . . . The signed copy would be sent as a final
    in the package when it's sent back to us.
        Q:   How is the package sent back to you for the
    final?
        A:   The –

Trial Tr. June 7, 2011 ("Tr. 6/7/11") 16:2-5. Because Long Beach

required that packages containing a final HUD-1 be sent via

Federal Express or overnight mail in order to close the deal,

and because the packages referred to in Counts 2-5 (containing

closing documents and a final HUD-1) were found in Long Beach's

files, the government argues that the jury could infer that

these packages were sent by mail to Long Beach.

The Sixth Circuit has held that "in cases where the

witness testifies that the company has a practice of using

United States mail, *and there is no evidence to the contrary*,

that testimony is itself sufficient to establish that a company

used the United States mail in a particular instance."  United

States v. Wall, 130 F.3d 739, 744 (6th Cir. 1997) (emphasis

added). This rule makes a distinction between cases in which

there is circumstantial evidence regarding a mailing (which is

sufficient), and cases in which there is circumstantial evidence

but also evidence of other forms of delivery (which is not).

Compare United States v. Stull, 521 F.2d 687, 690 (6th Cir.

---

Q:    Using what process?
A:    It would be a Federal Express or overnight they
would send it back to us.
Q:    Okay. Was that a requirement of the closing
condition?
A:    Yes, it would be.

Tr. 6/7/11 15:12-16:5.

7

1975) (finding insufficient evidence when the defense attorney elicited testimony from the recipients' president-manager that some work orders were personally delivered and no stamped envelope was introduced).

The Fourth Circuit, in examining a case with similar facts to the instant case, affirmed the defendants' mail fraud convictions. In United States v. Delfino, the defendants were accused of committing mail fraud when they submitted a fraudulent loan application to Countrywide, a loan company. 510 F.3d 468, 471 (4th Cir. 2007). At trial, a Countrywide loan officer testified that he had no specific knowledge of the defendants' loan application, but that Countrywide's business practice was to send a return envelope along with the loan application, and that the borrower typically returns the application in the envelope. The Fourth Circuit held that "the jury was entitled to conclude that the Delfinos likely returned their loan application by commercial carrier rather than the less likely, though possible, media of airplane, personal delivery, or facsimile." Id. See also United States v. Sumnicht, 823 F.2d 13, 15 (2d Cir. 1987) (holding as sufficient the testimony of two Merrill Lynch employees who stated that the company ordinarily received claim forms through the mail and had

no recollection of any claims submitted by out-of-town-companies

that were not submitted through the mail).

The defendants point to <u>Hannigan</u> for the proposition

that Mr. McDiarmid's testimony is too general and lacks personal

knowledge of Long Beach's business custom or practice. In

<u>Hannigan</u>, the Third Circuit deemed insufficient the testimony of

a claims officer who testified to dropping letters with the

company's mail department, but not knowing what happened

afterward.  The court held that "she had no personal knowledge

concerning the routine practices of the mail room." 27 F.3d 890,

895 (3d Cir. 1994); <u>see also</u> <u>United States v. Stull</u>, 521 F.2d at

690. However, the <u>Hannigan</u> court did not clarify how specific

the knowledge must be – most relevantly here, whether personal

knowledge of the company's process is sufficient, or whether it

must be personal knowledge of the office or mail room in

question.

The Court holds that the government's case is

sufficient to sustain the jury's conviction. Unlike in <u>Stull</u> and

<u>Hannigan</u>, the defendants did not point to any testimony, from

Mr. McDiarmid or otherwise, that is contrary to Mr. McDiarmid's

position that the use of U.S. mail is a requirement of Long

Beach's policy. <u>See, e.g.</u>, <u>Wall</u>, 130 F.3d at 744. Also, the

defendants did not point to any cases in which a court has held

that personal knowledge must be specific to a particular office. Given the high standard needed to overturn a jury verdict, the government's burden was satisfied with respect to Counts 2-5.

### C.  Wire Fraud Convictions (Counts 6-11)

#### 1.  Background

18 U.S.C. § 1343 prohibits the use of wire transmissions in interstate commerce to perpetuate a scheme to defraud. 18 U.S.C. § 1343. To prove wire fraud, the government must prove beyond a reasonable doubt both that the defendant communicated via wire and that this wire communication was interstate. E.g., United States v. Hedaithy, 392 F.3d 580, 590 (3d Cir. 2004). Due to the similarity in structure between the mail and wire fraud statutes, the Court's analysis of wire fraud can also refer to mail fraud precedent. United States v. Giovengo, 637 F.2d 941, 944 (3d Cir. 1980). The government has asserted six counts of wire fraud, which are linked to two mortgage transactions, for the properties of 136 Billings Drive and 278 Park Ridge Drive.

Defendants argue that the government has not put forth sufficient evidence to demonstrate that the documents in Counts 6 through 11 were communicated through interstate wire. The Court will analyze each count in turn.

10

2. Count 6: Purchase and Sale Agreement, 136 Billings
   Drive Property

Count 6 refers to a document entitled "Agreement to Sell Real Estate" ("sale agreement") for 136 Billings Drive, in Chalfont, Pa. The document is from the files of J.P. Morgan, formerly Long Beach. It has a fax letterhead on top, stating the sender, American Mortgage, a phone number with a New Jersey area code, and a time and date stamp.

The government argues that Count 6 is substantiated by testimony from John Bariana, the purchaser of this property and business partner of Mr. McCusker. Mr. Bariana testified to the general practice of American Mortgage during his time there. Mr. Bariana stated that everyone was "on the same page to get the loans approved as quickly as possible." Tr. 6/13/11 23:15-16. According to his testimony, American Mortgage would submit the loan application to the bank, which would come back with a list of documents required in order to obtain loan approval, including purchase and sale agreements. Id. 21:5-10. To expedite the process, his office would falsify purchase and sale agreements; in fact, Mr. Bariana testified that in the transactions he did with Jacqueline McCusker, there was not a single genuine purchase and sale agreement or loan application. Id. 21:23-22:9. In general, Mr. Bariana testified that when Mrs.

McCusker "processed loans, [there were] a lot of the forms that were needed to fax back and forth to title companies or lenders . . . ." Tr. 6/13/11 75:3-4. As he stated, "If there's documents that needed to be produced, we'd produce it. If they needed to be faxed, we faxed it." Id. 86:12-15.

Mr. Bariana also had specific knowledge with regard to the 136 Billings Drive transaction. The jury heard testimony that Mr. Bariana purchased the property and signed the purchase and sale agreement at issue here, but that the sellers' signatures were faked. Id. 88:2-9. In addition, Mr. Bariana stated that the 856 area code in the header was the number of his company's New Jersey office. Tr. 6/14/11 108:14-16.[3]

Finally, with regard to whether the document was faxed interstate, Mr. Bariana testified that "[w]e processed the loan from our office," and that at the time of this transaction, their office was located in New Jersey. Id. 44:20-21; 153:10-17.

_____

[3] Defendants argue that "absent testimony from either the sender or the recipient as to the fact that it was sent or received, the actual fax header is hearsay." Def. Mot. at 22. They cite the case, United States v. Pelullo, which held only that wire transfer documents do not fall under the business records hearsay exception. 964 F.2d 194, 199 (3d Cir. 1992). Its analysis refers to the reliability of bank records and makes no mention of fax headers at all. Moreover, there is sufficient evidence here to corroborate the fax header. Cf. U.S. v. Bollin, 264 F.3d 391, 407 (4th Cir. 2001) (using a fax header as corroborating evidence).

As for Long Beach's office location, the government points to a number of documents admitted into evidence which state that Long Beach's office was located in Vernon Hills, IL. Just as one example, in the HUD-1 form related to the 136 Billings Drive property described _infra_ in Count 7, the address of the "lender," Long Beach Mortgage, is listed as Vernon Hills, IL.

The Court finds that there was sufficient evidence in front of the jury to convict the defendants on this wire fraud charge. First, Mr. Bariana has testified that as a general matter, all of the transactions with Mrs. McCusker involved faked purchase and sale agreements. He also testified that the loan "process" involved many faxes; in this specific instance, his testimony is corroborated by the fax header on the top of the document. Finally, Mr. Bariana testified that American Mortgage was located in New Jersey, and there is evidence in the record that Long Beach's office is in Illinois.

### 3. Count 7: HUD-1 for 136 "Billingsley" Drive

Count 7 refers to a U.S. Department of Housing and Urban Development Settlement Statement form ("preliminary HUD-1") from First County Abstract. This document is also from the files of Long Beach. It has a fax header, time and date

stamped, with "Bennett & Doherty" and a fax number with a Pennsylvania area code.

The government's argument in support of Count 7 is analogous to its argument for the mail fraud charges. It argues that Mr. McDiarmid's testimony regarding Long Beach's business customs establishes that the forms waere faxed by Bennett & Doherty to the "closer" in the Long Beach pod. Tr. 6/7/11 60:7-11. Documents introduced into evidence then refer to Long Beach's Illinois office as the "closing agent." Because Long Beach required that the forms be faxed to the closing agent, and the forms were found among Long Beach files, the jury could conclude that the forms were faxed.

The form at issue in Count 7 also involves additional pieces of evidence that do not exist in the mail fraud charges. First, whereas the mail fraud charges did not have evidence of actual mailing apart from Mr. McDiarmid's testimony, here the document itself has a fax header that can serve as corroborative evidence. See, e.g., U.S. v. Bollin, 264 F.3d 391, 407 (4th Cir. 2001). Second, Mr. Bariana, who has personal knowledge of this transaction, testified that the document was prepared by First County Abstract, a company owned by Bennett & Doherty. Tr. 6/13/11 90:21-23.

In terms of whether it was faxed interstate, the fax header lists a Pennsylvania area code and the preliminary HUD-1 form itself lists the "place of settlement" for First County Abstract as Doylestown, PA.  The form then lists Vernon Hills, IL as the address of the lender. The Court is persuaded that this is sufficient evidence upon which the jury could convict the defendants on Count 7.

    4. <u>Count 8: Wire Transfer from Long Beach Account, 136 Billings Drive</u>

Count 8 refers to a wire transfer that occurred in the 136 Billings Drive transaction between Long Beach and the closing agent/disperser of funds. The government offers two pieces of evidence to support the fact that such a transaction occurred. First, Mr. McDiarmid testified that it was Long Beach's custom and practice to "wire the funds . . . to the closing agent's bank account." Tr. 6/7/11 14:17-25. Second, a "Wired Funds Information" sheet was introduced into evidence to corroborate the fact that a wire occurred in this particular transaction. This exhibit describes a wire from Long Beach to receiver Third Federal Bank, and lists the beneficiary as Bennett & Doherty in Doylestown, PA.  It then includes wire

transfer instructions from First County Abstract and Bennett & Doherty as further corroboration that the transaction occurred.

As for the interstate nature of the transaction, the government relies again on the testimony of Mr. McDiarmid, who stated that for a Pennsylvania loan, it was customary for Long Beach to wire the money from California to Pennsylvania. Id. The "Wired Funds Information" sheet states that both the receiver bank and the beneficiary of the wire transfer were located in Doylestown, PA. The Court holds that this is adequate to support the jury's conviction.

5. Count 9: Purchase and Sale Agreement, 278 Park Ridge Drive Property

Count 9 refers to a purchase and sale agreement for the transaction involving 278 Park Ridge Drive in Perkasie, PA. The document is also from the files of Long Beach and was introduced by Mr. McDiarmid. It contains a header with "American Mortgage" and a time and date stamp, but no phone number.

To establish that this document was sent via wire or facsimile, the government points to the testimony of Candis Ramage, a loan processer at Long Beach Mortgage. Ms. Ramage worked on the transaction at issue and she testified about

working exclusively with, and receiving faxes exclusively from, her contacts Ed and Jackie. Tr. 6/9/11 55:11-13; 57:19-20. The government argues that from the totality of the evidence at trial, the jury could infer that the purchase and sale agreement was faxed from Axxium to Long Beach.

The Court is not persuaded by this argument. Although Ms. Ramage does refer to faxes she received from the defendants, the government never showed Ms. Ramage Exhibit 11A, the purchase and sale agreement, and she never testified that this document came to her via fax. In fact, Ms. Ramage stated that sometimes, she did not receive from the underwriters a condition requesting a fully executed purchase contract; presumably, then, she did not request or receive such an agreement from the defendants. Id. 38:1-13. Thus, there is evidence that Ms. Ramage did not always receive purchase and sale agreements, which is contrary to the business custom argument put forth by the government in its brief. Cf. Wall, 130 F.3d at 744.

The jury heard testimony from Mr. Bariana about creating and transmitting fraudulent purchase and sale agreements to Long Beach. Mr. Bariana's testimony about the transmission of purchase and sale agreements, and in particular regarding the 136 Billings Drive transaction, could speak to the business custom of Axxium Mortgage generally. However, Mr.

17

Bariana had little recollection of the 278 Park Ridge Drive
transaction and was never shown the purchase and sale agreement
related to that transaction. Tr. 6/13/12 99:23-101:25.

Given that the purchase and sale agreements were only
sometimes faxed to Ms. Ramage, the Court does not believe that
Mr. Bariana's testimony is sufficient to establish a business
custom as to the 278 Park Ridge Drive transaction. In addition,
the fax header has less information here than in Count 6, as it
does not state a fax number that reflects whether the fax was
sent interstate.  The Court holds that the government did not
satisfy its burden as to Count 9.


### 6. Count 10: HUD-1 Form, 278 Park Ridge Drive

Count 10 refers to a preliminary HUD-1 Form for the
transaction involving 278 Park Ridge Drive. It has a fax header
on top with a time and date stamp, the words "Bennett &
Doherty," and the same fax number, with a Pennsylvania area
code, as that which is on the top of Count 7's HUD-1 Form.

As the government has stated, the analysis of Count 10
is likely to be identical to that of Count 7.  Thus, because
Court finds that testimony from Mr. McDiarmid about the
recipient's business customs, as corroborated by the fax header
and documentary evidence of the location of the recipient Long

Beach, is sufficient for purposes of Count 7, then it is also
sufficient for Count 10.

### 7. Count 11: Wire Transfer, 278 Park Ridge Drive

Finally, Count 11 refers to a wire transfer relating
to the 278 Park Ridge Drive transaction.

The government's proof as to Count 11 mirrors Count 8,
the wire transfer relating to 136 Billings Drive:  Mr.
McDiarmid's testimony that, as a general matter, money was wired
from California to the state in which the transaction was taking
place (here, Pennsylvania). However, the corroboration is much
weaker for Count 11. Unlike Count 8, the government has not
brought to the Court's attention any admissible "Wired Funds
Information" sheet to corroborate the assertion that this
specific transaction occurred.  Moreover, even if the wire
transfer did occur, the government has not pointed to any
evidence demonstrating that the wire transfer occurred
interstate.[4]

The Court notes that testimony from a Bennett &
Doherty employee would have been helpful in substantiating this

---

[4] Indeed, in its brief in opposition to the defendants' motion
for acquittal, the government's argument supporting Count 11 is
minimal at best.

count. At the grand jury stage, the government elicited the testimony of Barbara Holmes, an employee of Bennett & Doherty; however, at the trial stage, nobody from Bennett & Doherty testified. In fact, the Court specifically asked the government whether somebody from Bennett & Doherty would eventually testify, to which the government responded "Yes, your Honor. Either someone from Bennett & Doherty, or one of the agents who subpoenaed the records from Bennett & Doherty." Tr. 6/7/11 89:18-23. However, no employee from Bennett & Doherty ever testified. Without such testimony, there is insufficient evidence in front of the jury to sustain a conviction as to Count 11.

Given the high standard with which the Court considers Rule 29 motions, the Court is persuaded by the government that the convictions relating to Counts 2-8 and Count 10 are proper. However, the Court holds that the defendants are entitled to a judgment of acquittal as to Counts 9 and 11. Thus, the Court grants the defendants' motion for acquittal for Counts 9 and 11 and denies the defendants' motion as related to Counts 2-8 and 10.

III.   <u>Other Counts</u>

Having reviewed the evidence, the Court finds that the evidence was sufficient for the jury's verdict on the charge of conspiracy to commit mail or wire fraud as to each defendant. The Court agrees with the government that the testimony of John Bariana and Amin Taquabee alone would be sufficient for the jury to sustain the conspiracy count. The fact that the Court has already found sufficient evidence with respect to the mail fraud and some of the wire fraud counts removes a major argument of the defendants with respect to the sufficiency of the evidence for this conspiracy count.

The defendants assert that the Court erred in admitting the loan files. The Court will overrule the objection to the loan files as it did during the trial of the case.

The Court also denies the motion with respect to the charge of conspiracy to commit money laundering. The Court concludes that there is sufficient evidence to sustain the convictions on this count. The Court has already found sufficient evidence to support most of the mail and wire fraud counts and concludes that the money laundering conspiracy is not "merged with the fraud conspiracy." In addition, the Court finds sufficient evidence of concealment and promotion.

Finally, the Court concludes that the instructions were appropriate and in fact the Court was not requested to make a change to them.

An appropriate order shall issue separately.